**THE STATE OF NEW HAMPSHIRE**

United States District Court – District of NH

| John Doe | | |
|---|---|---|
| v. | | Civil Action No. |
| Franklin Pierce University | | |

**COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1. Plaintiff John Doe[1] brings this action in the immediate wake of his unjust and unlawful three-semester suspension from Franklin Pierce University (FPU), where he was a rising senior student-athlete until April 7, 2022. That day, after a Title IX evidentiary hearing, FPU announced his suspension for three semesters and a permanent brand on his school record as a perpetrator of "dating violence." After a brief stay during an appeal period, this harsh discipline was reinstated on a permanent basis on May 17, 2022.

2. During the Title IX investigation and hearing procedure that led to this ruling, agents of FPU repeatedly violated Title IX, and the school's own rules governing investigative, pre-hearing, and hearing procedures, all to John Doe's prejudice.

---

[1] Plaintiff seeks to file this complaint and all pleadings under the pseudonym, "John Doe," due to the serious and false nature of the allegations against him, and in order to protect his privacy interests. He intends to refer to himself as John Doe and the complainant as Sally Smith, designations which will protect his privacy interest but also serve to protect the complainant's privacy interests. He has concurrently filed with this complaint a motion requesting such a designation. This complaint refers to both by first names, simply for ease of reading as the last names do not imply a gender. Plaintiff will file an affidavit, under seal, providing his name, address, and attesting to the accuracy of the facts alleged in the complaint if the court so requests.

3. During the 2018-2019 school year, when John and "Sally Smith" (*see* fn. 1) were both freshman, they began dating. They had an on-again, off-again relationship that continued through the fall of their junior year. Acquaintances described their relationship as "toxic."

4. After a physical altercation on October 27, 2021, Sally brought a complaint against John. The complaint against John, as described in official correspondence from FPU, referenced only one specific date, October 27, 2021.

5. FPU did not provide John a list of what turned out to be seven counts of violations of "Franklin Pierce University Title IX Policy *and/or* the Sexual Misconduct Policy,"[2] (emphasis added), and seven counts of violation of the Franklin Pierce University Code of Conduct (Conduct Code), until after the school had officially closed the investigation. Indeed, John did not receive a detailed list of charges against him until less than nine days before the scheduled final hearing.

6. FPU conducted the investigation in a biased and unfair manner. FPU failed to give John the same opportunity to participate in the investigation that it gave Sally. Then, FPU failed to provide John's advisor with notice and an opportunity to respond to the draft investigation report. After the investigation closed, FPU scheduled a final

---

[2] "FPU IX [#]" refers to the Franklin Pierce University Title IX Policy and PDF page number. "SMP [#]" refers to the Franklin Pierce University Sexual Misconduct Policy and PDF page number.

hearing, having still never provided a formal detailed notice of charges. In all of these failings, FPU violated Title IX and FPU policy.

7. FPU retained Attorney Kevin O'Leary to serve as the Hearing Officer. Accordingly, Attorney O'Leary became FPU's primary point of contact regarding the matter.

8. As the conduct hearing approached, John was increasingly concerned that he had not been notified of the specific charges against him. When John brought up to Attorney O'Leary that there had not been notice of the specific charges, FPU finally provided a list of charges. The late notice came less than 10 days before trial and after the investigation had closed, in violation of school policies and federal law. During the conduct hearing, Attorney O'Leary repeatedly barred evidence that impeached Sally's credibility, and the credibility of other witnesses, characterizing it as "irrelevant." After the hearing, John was held responsible for two violations of FPU's Title IX policy, for "dating violence," and four of the seven alleged violations of the Code of Conduct.

9. Because FPU violated provisions of Title IX repeatedly throughout this process, and because FPU breached its contract and other duties owed to John by failing to adhere to its own rules during the pre-hearing and hearing process, John brings this action for injunctive relief and monetary damages.

## JURISDICTION AND VENUE

10. This action arises out of FPU's violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, as well as its breach of its contractual obligations to John Doe.

11. John is an out-of-state resident and FPU is a resident of New Hampshire. The amount in controversy is over $75,000.

12. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

13. Venue is proper in this district under 28 U.S.C. § 1391(b)(2).

## PARTIES

14. John Doe is a United States citizen who resides outside of New Hampshire. At all times relevant to this complaint, he was a FPU undergraduate student.

15. Defendant, FPU, is a private university in Rindge, New Hampshire that receives federal financial assistance.

## FACTS

### John Doe's Academic and Athletic Background and Goals

16. Prior to attending FPU in New Hampshire, John was an active member of his community in his home state of Minnesota. He participated in Boy Scouts of America, worked hard to achieve recognition as an Eagle Scout, and involved himself in charity work with his church. John also organized a drive to donate sports equipment to gyms in underprivileged areas of his community for his Eagle Scout project.

17. Further, John played for his high school basketball team, the "Edina Hornets." He also played for multiple Amateur Athletic Union ("AAU") travel basketball teams, including the Minnesota Magic, the Crossfire, and the Urban Stars, which won a State Championship during John's sophomore year in 2015.

18. FPU awarded John a full scholarship to join FPU as an undergraduate student and play for its basketball team. After his first year, FPU continued to award John a full scholarship but recast it as part athletics and part academic. John chose to major in marketing. John maintained a B average until FPU's Title IX investigation began, when amidst the stress of these proceedings, his grades declined. Prior to FPU's suspension, John was in his fourth year at FPU, on track to graduate in December of 2022.

19. While a student at FPU, John participated in intramural sports and performed volunteer work through the school basketball team.

20. During his time at FPU, John was a member of the men's basketball team. FPU is a NCAA Division II school that competes in the New England 10 Conference. Basketball has been John's biggest passion for as long as he can remember. In his more recent time at FPU, John became a mentor to younger team members and made a positive impact on team morale.

21. John considered himself close with his teammates, some of whom were even roommates. John lived in housing for the basketball team and cherished the camaraderie that comes with being a student athlete.

22. Until he was suspended for three semesters and branded on his official transcript with Title IX and Conduct Code violations, John looked forward to completing his marketing degree and working towards a master's degree.

23. John also hoped to continue pursuing his passion, basketball, as he had two more years of NCAA eligibility, which he could have utilized in graduate school. He hoped to play professional basketball, either in the United States or overseas.

<b><u>Plaintiff's Relationship with Sally Smith</u></b>

24. John Doe met Sally Smith in 2018 during their freshman year at FPU. Beginning that year, John and Sally had an intimate, romantic, and sexual relationship.

25. Over the course of their relationship, John and Sally took multiple trips together. For the first of these trips, the summer after freshman year, John and Sally met up in Wisconsin, staying in a rented cabin for three days. Later that summer, Sally went to Minnesota to visit John at his family home. Sally stayed with John and his parents. And the summer after sophomore year, the parties took a trip together to Chicago.

26. When on campus, the two would commonly sleep over in each other's dorm room.

27. The relationship between Sally and John was described by their friends as "toxic. They were "on-again off-again," breaking up prior to their junior year.

28. Sally and John had friends in common and after the breakup, would still see each other at social events. One such event was a social gathering at a lake. After this event, the two did not see each other for approximately six months.

29. In the summer of 2021, Sally and John reconciled and met in Chicago again. The relationship continued into the fall of 2021, eventually ending for the final time on October 27, 2021.

30. During the Title IX investigation process, Sally made various claims of sexual assault and/or physical violence that are discussed in more detail below, some of which she alleged occurred during their trips together.

**Notice of Sally's Complaint**

31. On October 27, 2021, FPU sent a letter by email to John, and hand-delivered it to him 15 minutes before he was to depart for a basketball scrimmage at another college. The emailed letter informed him that he had been evicted from student housing "on an emergency basis," and commanded: "You have 30 minutes to pack your things and return your residence hall keys to Campus Safety." The letter explained that "[i]n response to the incident reported on October 27," FPU had concluded that he "pose[d] an immediate threat to the physical health or safety of a student or other individual arising from the allegation in the report." The letter stated that the "specific reasons for the decision" were: "Reported abuse of another student including suffocation, physically dragging the individual, and sexual assault."

32. The letter provided no further detail of the allegations against John. The letter did not state that the allegations covered a broader time period than the "incident" referred to as having occurred on October 27.

33. On October 28, 2021, John appealed the emergency removal and was allowed to return to campus.

34. On October 29, 2021, John received notification of a formal complaint by Sally which alleged "[p]hysical dragging, suffocation, and sexual assault on October 27th, 2021, *as well as other forms of physical and emotional abuse throughout your relationship*. In addition, recording and distributing a video without the other party's consent." (Emphasis added). Along with the complaint, John received a No Contact Order, prohibiting all contact between himself and Sally.

35. FPU'S Title IX Grievance Policy mandates that prior to initiating an investigation, "[a]ll parties will receive a Notice of Investigation which shall include information regarding the Title IX Grievance process, ... [and] *the allegations of the sexual harassment or assault (including sufficient detail, identities of parties, date, time, location, etc.)."* Grievance Policy at 25 (Emphasis added).

36. Despite its policy, FPU did not provide, prior to initiating the investigation, any further explication of the dates, times, or specific details of the violations, other than the vague reference to "other forms of physical and emotional abuse throughout your relationship."

**FPU's Procedurally Deficient Investigation**

37. After notifying John of the formal complaint, FPU enlisted the services of an investigator, Attorney Susan Schorr.

38. On November 8, 2021, Attorney Schorr contacted John to schedule an interview, informing John that he had the right to have an advisor present. On November 17, 2021, John sent correspondence to Attorney Schorr, stating: "[M]y advisor who will be present is my lawyer Ted Lothstein." John was represented by the identified advisor, Attorney Lothstein, throughout the investigative process.

39. Attorney Schorr began her initial interviews by interviewing Sally on November 19, 2021. John and his advisor scheduled a recorded videoconference interview with Attorney Schorr for December 14, 2021. Prior to this interview, FPU had still not provided any "sufficient detail," including "time, date, location, etc." for the allegations against John, other than stated in paragraph (30) above.

40. It became apparent to John during the December 14 interview, however, that Sally and/or other unknown individuals had told Schorr about many separate episodes of conflict over the parties' three-year relationship. Indeed, the Final Report that was later provided to the parties (see paragraph 80 below), recounted no less than *twenty* separate episodes of alleged sexual violence, physical violence, or other abusive behavior.

41. John was asked to answer questions about these twenty episodes with no prior notice, putting him at an unfair disadvantage by denying

him a meaningful opportunity to prepare for the interview and by denying him the rights he was supposed to have according to FPU's Title IX Grievance policy.

42. Near the end of John's interview, Attorney Schorr stated that she anticipated another interview with him. John looked forward to this, because he had been blindsided by the variety of topics spanning a three-year period that Attorney Schorr inquired about. John wanted an opportunity to discuss them further after time for reflection and conducting his own investigation (for example, looking for messaging evidence in his phone).

43. In addition to requiring written notice of the date, time, location, and "sufficient detail" of the alleged conduct in violation of FPU's Title IX Grievance Policy *prior to* the initiation of the investigation, FPU's Grievance Policy mandates further notice *during the* investigation as follows: "Any new alleged violations that come about during the investigatory process will result in a new/updated notice to all parties." FPU IX 25.

44. The investigatory process spanned from around November 8, 2022 when Attorney Schorr reached out to John, to January 21, 2022 when Attorney Schorr sent her Report to FPU. During these two-and-one-half months, Schorr investigated about twenty separate episodes of alleged abuse. But during these two-and-one-half months, FPU *never* provided any "new/updated notice" describing the "new alleged violations," other

than the description of a single event alleged to have occurred on October 27, 2021, in violation of its own written policy.

45. Third-party witnesses and/or John provided information to Attorney Schorr that led her to conclude that Sally had not been fully forthcoming in the initial interview, because Sally had "downplayed any role she had in fostering a contentious dynamic in her relationship with [John]." For example, when discussing drug use in the relationship, Sally failed to disclose that she had been the first person to introduce LSD into the relationship. Similarly, when discussing alleged aggressive or abusive conduct by John, Sally failed to disclose that she would surreptitiously examine the contents of John's phone without his permission or knowledge, or that she had pushed John into a lake, destroying his phone.

46. Attorney Schorr provided Sally a second interview on December 29, 2021, giving her an opportunity to attempt to explain her incomplete and inaccurate description of her relationship with John.

47. In addition, Attorney Schorr conducted interviews of other eleven witnesses.

48. Even though she saw fit to give Sally repeated opportunities to explain herself, and even though she interviewed nearly a dozen additional witnesses, Attorney Schorr never contacted John or his advisor to schedule a follow-up interview.

49. On January 21, 2022, after not hearing anything from Attorney Schorr for over a month, Attorney Lothstein emailed Attorney Schorr to

follow up on the first interview. Attorney Schorr responded that she had submitted the report to the Title IX office and Attorney Lothstein should expect to receive it soon. Thus, despite prior representations to the contrary, Attorney Schorr concluded her investigative process by giving only Sally repair her credibility after an unsatisfactory first interview, while denying John the opportunity for a further interview despite the wholly inadequate notice before his first interview.

50. On February 14, 2022, the draft investigation report was sent by email to John. Attorney Lothstein, his identified advisor, was not included in the email or sent the report separately. The email provided a deadline to respond to the investigation report to provide any additional evidence. John, however, did not see the email until March 6, 2022.

51. The failure to send the report and exhibits to John's identified advisor violated FPU's own policy governing these proceedings. It states that "[b]efore the report is *completed*, the investigator will send the report and accompanying evidence to the Complainant and Respondent <u>and their respective identified advisors</u>." FPU Policy at 25 (emphasis added).

52. FPU's failure to send the completed investigation to John's advisor also violated federal law. 34 CFR 106.45(b)(5)(vi) provides: "Prior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, and the parties must have at least 10 days to submit a written response, which the investigator will consider prior to completion of the investigative report."

53. The email disclosure from FPU provided a deadline of February 23, 2022, for John to respond to the investigation, but since it was not copied to his advisor, in violation of FPU policy and federal law, his advisor received no notice of this deadline.

54. John did not see the February 14 email, and did not open it until he discovered it around March 6, 2022, well past the deadline. But if the investigation report had been copied to his advisor as is required by FPU Policy and federal law, John's advisor would have opened the email, and John would have had the opportunity to respond to the investigation in a timely manner.

55. On or about March 6, 2022, past the deadline, John was cleaning out old emails and was horrified to find the unopened 02/14/22 email. When he read it, he was sickened to read, *for the first time*, the full scope of the allegations against him, which had never been made available to him during the investigation itself. He became even more emotionally upset and frantic when he realized that the deadline for response had passed, and the investigation had concluded.

56. When John read the report, he was disappointed to see that Attorney Schorr discounted his credibility compared to that of Sally, on the stated basis that his descriptions of events were more vague. Somehow, Attorney Schorr had overlooked the obvious: Sally came in with twenty stories to tell about alleged abusive behavior by John, stories that she had months to develop and refine since her initial report of a single incident. FPU provided John no notice whatsoever as to the dates,

locations or details of 19 out of the 20 stories. Attorney Schorr then gave John just one interview, at which time he learned, on the fly, of the accusations against him.

57. Thus, during the interview, John was asked to respond to probing questions about 19 allegations that were new to him, without prior notice, without time for reflection, without time to look at extrinsic evidence such as cellphone communications or social media postings to refresh his recollections, and without an opportunity to consult with his advisor. And then, Attorney Schorr criticized the lack of specificity in John's responses, without any recognition of a fundamental principle in our law: There can be no due process, and no meaningful opportunity to be heard, without prior notice of the details of the accusations.

58. Either Attorney Schorr judged John's credibility under the mistaken view that he had prior notice and plenty of time to formulate his responses to the allegations, or she never considered the obvious ramifications for respondent when those notice requirements were ignored such that only one of the two parties going into the investigation knows what the investigation is about. This provides further evidence that the investigation's failure to meet the basic standards required by either Title IX, or FPU's own rules governing these hearings, severely prejudiced John's ability to meaningfully respond to the allegations.

**Sally's Accusations Against John**

59. Sally made numerous accusations of sexual assault, dating violence, and other student code of conduct violations against John. All

allegations of sexual assault were eventually dismissed by the hearing board, despite Attorney Schorr's endorsement of Sally's credibility. The basic facts and circumstances underlying Sally's accusations are as follows.

60. In the summer of 2019, Sally went to visit John in his home state of Minnesota. Sally stayed with John and his family. Sally alleges that during this visit, she and John took LSD together and that John then sexually assaulted her by putting his penis near her mouth, resulting in Charge A(a).

61. The relationship continued into their sophomore year. This year Sally was rooming with a friend and volleyball teammate, "Lauren."[3] The two had a rule that they would allow overnight guests, but a roommate would not engage in sexual activity if the other was present in the room.

62. In the fall of 2019, on an evening that constituted one of the charged, undated, offenses (Charge A(c)), John stayed overnight in Sally's room. Sally's roommate Lauren was present in the room that night.

63. Sally claimed that the next morning, she asked John whether they had sexual intercourse, and John either responded that she must have had a good dream, or simply acknowledged that he had sex with her while she was asleep because this is a privilege of being a boyfriend. (Sally told the story differently to different friends).

---

[3] Third party students involved in the investigation or hearing are referred to by their first names only.

64. Sally told her roommate Lauren that John had had sex with her while Sally slept (and apparently while Lauren slept), a story that absolved Sally for any culpability in violating their rule against sexual activity when a roommate was present.

65. At the hearing, Sally presented her story that she had been raped in her sleep, in support of one of the counts of violation of Title IX and/or the Sexual Misconduct Policy. Lauren, and Sally's friend Cierra testified that Sally told her them the story of John sexually assaulting her in her sleep, the morning after it allegedly happened.

66. Sally also made an undated allegation that John would create "consequences" like making hurtful comments or taking pillows and blankets at night, if she did not want to engage in sexual activity, resulting in Charges A(b) and B(a).

67. After a breakup sometime in the fall of 2019, John and Sally reunited in the summer of 2020. The two met in Chicago over the summer. On this trip, John had stopped to visit with strangers and Sally became uncomfortable. The two then had a disagreement about this event later that evening. Sally made an undated accusation alleging that John was hitting the walls during the disagreement, resulting in Charge B(b).

68. Sally created a TikTok social media post after the Chicago trip that referred to her "boyfriend" doing drugs on the street with homeless people. John was upset about the TikTok and asked that she remove it.

69. That same summer, Sally visited John in Minnesota again. The two were still having issues in their relationship and broke up prior to the start of their junior year.

70. While not in a relationship their junior year, John and Sally shared friends in common and would see each other at social events. One such event occurred at a lake. Sally pushed John into the lake. Afterwards, Sally asked John to meet her that evening because she wanted to make the relationship work. John agreed to meet her. Sally then noticed a hickey on John's neck which upset her. Later that evening Sally was engaging in sexual conduct with someone else when John walked in on them. This led Sally to allege that she was concerned John would use it against her to coerce her into doing certain sexual activities, resulting in Charge A(d).

71. In the summer of 2021, Sally and John reconnected and met in Chicago. While in Chicago, John stopped to speak with someone standing outside the hotel. After returning to their room, Sally confronted John about speaking with the stranger and John apologized.

72. The two continued their relationship into the fall of 2021.

73. On September 7, 2021, Sally went to visit John early in the morning when John was asleep. Sally's phone began to ring which woke up and upset John. Sally then turned her phone to vibrate, and it continued to go off. John made it clear that he was annoyed Sally came in so early and woke him up, as he needed his sleep.

74. Sally then took John's phone without his knowledge – *she stole his phone* – in retaliation. Sally left Rindge with the cell phone and took it to Keene. When John woke up later, he did not know where his phone was. He tore apart his room looking for it. It did not initially occur to him that Sally could be capable of stealing his phone as some kind of punishment for his complaints about her keeping him awake.

75. After a whirlwind of searching, John was able to determine that Sally had taken his phone by locating it on the Find My iPhone app and learning that Sally had tried to give it to one of John's friends.

76. Following this event, John and Sally argued via text messaging. John wanted Sally to apologize and make his bed as part of that apology since he had torn his bed apart when searching for the phone. John indicated to Sally that he would end the relationship if she did not apologize. Sally was upset with this ultimatum and characterized it as a threat, resulting in Charge B(c).

77. Later that same month, Sally and John attended a football game together. An argument arose at the football game. Sally alleges that the basis for this argument was John taking her hat and that he slapped her hand away when she reached to get it back, resulting in Charge A(e). Later that day, Sally began texting John wanting to discuss the argument further. John was not responding to Sally's texts. Sally then decided to go to John's room to continue the argument. John was taking a nap when Sally arrived. He was annoyed that she woke him up. John asked Sally to leave, but she refused. Sally alleged that John kicked her

off of his bed and that she fell into the wall, resulting in Charge B(e). At some point in the argument, after Sally's refusal to leave, John picked Sally up and put her outside of his room and into the hallway.

78. On October 20, 2021, Sally and John were at his townhouse with friends. Sally had gone into the bathroom where two of their friends were. John joined them shortly after. While in the bathroom John began flicking a lighter to the point of spark, but not to the point of flame, near Sally, resulting in Charge B(f). Smith moved away from John and told him to stop, which John did.

79. Later that same day, John and Sally stayed the night together. Sally alleged that John forced her to engage in sexual conduct without consent, resulting in Charge A(f).

80. According to Sally, even though she had been abused and sexually assaulted, she continued her relationship with John.

81. On October 27, 2021, Sally got up early to lift weights and returned to John's room with coffee and got into bed with John. Sally's friend began texting her, which woke John up. John was upset and an argument ensued. Sally then recorded the argument without John's knowledge.

82. The recording and subsequent text messages depicts the following: Sally is crying, and John asks her to apologize. Sally begins screaming and cursing at John, who responds by telling Sally to "get the fuck out." John is not heard yelling in the audio recording. He speaks in a normal tone at a normal volume., During this argument John asks

Sally to leave multiple times, but she refuses. At some point Sally begins hitting John and bites his arm. John puts his hand on Sally's face to stop her screaming because he is afraid it will disturb his roommates, resulting in Charge A(g). Sally eventually leaves, but she continues to text John about the argument. In those texts, John tells Sally that she should not attack him and asks for a conversation without her getting physical. John sends Sally a photo of the bite mark on his arm. Sally apologizes.

83. At approximately noon that same day, Sally returned to John's townhouse. John asked Sally to leave, and she refused. John then put Sally's bag with her belongings outside to get her to leave, resulting in Charge B(g). It was raining out. When Sally still refused, John began recording the disagreement. Sally can be seen in this video yelling, crying, and hitting John. John's roommate returned during the argument and escorted Sally home. The video was admitted as evidence at hearing.

### FPU's Disciplinary Process

84. On March 1, 2022, John received the finalized investigation report and notice of a hearing scheduled for March 10, 2022. At this point in the proceedings, John had not received a Notice of Charges, even though the hearing was less than 10 days away. Subsequently, after John brought up the lack of notice, the March 10 hearing was continued to March 24, 2022, to allow time for FPU to research the rule requiring the Notice of Charges and produce such notice.

85. On March 15, 2022, John received, *for the first time*, and more than two weeks after the investigation had officially closed, a Notice of Charges. On March 21, 2022, John requested another continuance of the hearing, as the Notice of Charges was provided to him less than nine 24-hour periods before the scheduled March 24 hearing. Once again, FPU had violated its own written policies. In addition to the requested continuance, John informed Attorney O'Leary that he was now identifying Attorney Kaylee Doty as his advisor and Attorney Lothstein as his confidential support person.

86. On March 22, 2022, a prehearing conference was held via Zoom to address the requested continuance and other prehearing matters. Attorney O'Leary stated that John would not be allowed time to submit witness interviews, because he did not respond to the draft report within the allotted time. In this conference, Attorney O'Leary stated that they would consider continuing the hearing but did not yet provide a potential hearing date. Attorney Lothstein provided Attorney O'Leary with four dates when he would be traveling out of State and requested that the hearing not be scheduled during those four dates.

87. During that conference, where Attorney O'Leary told John he could not submit witness interviews because he missed the deadline, John reminded Attorney O'Leary that the report was never sent to his identified advisor. John, a busy student athlete, had simply failed to notice an email, a mistake that, in all likelihood, most professionals have made at some point in their work. But Attorney O'Leary responded by

saying words to the effect that it didn't matter, all that mattered was that John failed to open the email, so he lost his opportunity to make timely response.

88. On March 22, 2022, Attorney O'Leary informed John and his advisor that the hearing would be continued, and that FPU would be in touch to reschedule the hearing.

89. On March 24, 2022, a second prehearing conference was held via Zoom. In the conference, Attorney O'Leary informed John that they had scheduled the hearing for one of the four dates that Attorney Lothstein was unavailable. Attorney O'Leary further stated that Attorney Lothstein would not even be allowed to attend the hearing, as "university policy" does not allow the confidential support person to attend.

90. Attorney Lothstein requested that FPU make an exception and reconsider, because he was also John's attorney, he was Attorney Doty's supervisor, and that the attorneys may need to consult together during the hearing. Attorney O'Leary responded by stating that he would submit the request that Attorney Lothstein be allowed to attend as the confidential support person, but that the board "may not want to provide a training opportunity" for Attorney Doty, or words to that effect. Attorney O'Leary, a much older male attorney, appeared utterly unaware of the irony inherent in his reference to a younger female attorney in this condescending manner during a Title IX proceeding.

91. On March 29, 2022, John submitted a Request to Dismiss the charges, as FPU had not conducted the disciplinary proceedings with

basic fairness and had conducted the proceedings in such a manner that it was no longer reasonable to expect that the process could result in a fair and impartial decision. In this request, John cited to FPU's multiple violations of both federal law and FPU's own policies throughout the proceedings.

92. One such violation included the exclusion of John's confidential support person, when FPU policy *required* that the confidential support person be allowed to attend the hearing. FPU IX 21; SMP 16. Dean Andrew Pollom, Title IX Coordinator, responded the following morning, stating that FPU "do[es] not have in [its] process a motion to dismiss and so at this time [it] will continue moving forward…"

93. Shortly after receiving this correspondence, Attorney Lothstein reached out to Dean Pollom to verify if FPU's response indicated they would not let Attorney Lothstein attend the hearing as a confidential support person, despite being confronted with their own policy requiring otherwise. Dean Pollom responded to that email, stating that the request has already been addressed. However, just minutes after this email, Attorney O'Leary called Attorney Lothstein and retracted FPU's decision, stating that Attorney Lothstein would be allowed to attend the hearing after all. Attorney Lothstein had changed the dates of his planned trip and thus was able to attend the hearing as John's confidential support person.

94. This reversal of position was the third instance during the proceedings of FPU implicitly acknowledging that it had failed to follow its own rules.

**The Title IX Hearing**

95. The conduct hearing occurred on April 5, 2022. The hearing was conducted over Zoom, while the parties were in separate rooms accompanied by their advisors and confidential support persons. After opening statements, the Board and parties were able to ask questions of the investigator, Attorney Schorr.

96. During this questioning, Attorney Schorr addressed the issue of Sally not being forthcoming in the first interview and stated that Sally only told stories that Attorney Schorr described as "paint[ing] her in the perfect light." Attorney Schorr stated that she felt the term "dishonesty" was too harsh to describe Sally's behavior.

97. Attorney Schorr further stated that she determined Sally to be credible because she was able to recall situations that John could not and provide details. Even when John did recall events, Attorney Schorr would paint them in a way that favored Sally. For example, when asked if John ever stated that the physical contact he had with Sally was in self-defense, Attorney Schorr stated that John never used those words, but that he had, admittedly, mentioned removing Sally from his room during the video-recorded altercation where she is seen hitting him. Rather than self-defense, Attorney Schorr labeled this as "disciplinary action" towards Sally.

98. Attorney Schorr also explained why she did not provide John with a second interview, despite her statement indicating she would. She stated that her second interview with Sally did not provide any new information and given John's denial of certain events, she did not think it would be productive. Despite Attorney Schorr's explanation, there are multiple instances of new information being presented in Sally's second interview, as referenced above. It was unfair and biased of Attorney Schorr to not allow John a second interview to address whatever credibility issues she perceived that he had exhibited in the first interview, when she afforded this special treatment to Sally.

99. When asked if it's possible that Attorney Schorr made other similar mistakes in the report, Attorney Schorr denied the possibility, stating that she believed everything else in the report to be accurate. Attorney Schorr did not provide transcripts or recordings for the 11 other witnesses she interviewed. There is no record to compare what those witnesses said during the investigation with the actual content of the investigation report.

100. Additionally, more than one of the third-party witnesses could not recall making statements that Attorney Schorr had attributed to them in her report. Attorney Schorr's bias towards Sally and the discrepancies in her report raise serious concerns as to its accuracy, effectiveness, and overall fairness. While the investigator did not make the hearing determination herself, the board relied on her report and statements at the hearing in making its decision.

101. Contradicting Attorney Schorr's endorsement of Sally's credibility and ability to recall events/details, Sally contradicted herself in her testimony during the hearing. Sally was confronted with the three different stories that she had told friends regarding the allegation of John engaging in sexual contact with her while she was asleep. To explain the discrepancies, she confessed that she sometimes loses entire memories, only for them to come back at a later point in time.

102. John also testified about the allegation of Sally being asleep. John testified that Sally had been an obviously-awake participant who physically initiated the sexual activity and fully participated in it. He argued that she made up the story to falsely absolve herself of blame and erase any embarrassment over violating the pact with her roommate.

103. John further testified in response to the remaining sexual assault allegations that he never engaged in any nonconsensual sexual conduct with Sally and that he respected her decision when she did not want to engage in sexual conduct.

104. When testifying about the hat incident, John admitted that taking Sally's hat sounds like something that could have happened, but he did not recall it ever happening. John stated that the two were playful and that is the sort of playful thing that the two would do. John did not admit to taking Sally's hat or recall that the event happened. In its decision, however, the board stated that John "admitted" to taking Sally's hat and took that into consideration in their decision. The board erred in considering John's testimony an admission.

105. When Attorney O'Leary was questioning John, his advisor Attorney Doty objected to a question. Attorney Doty explained her objection. Attorney O'Leary's response was to ignore the substance of the objection and instead simply order that Attorney Doty "not interrupt" the questioning. Accordingly, FPU limited John's protection from improper questioning, yet again displaying bias against him.

106. The Board also erred in determining that there was "no evidence" supporting John's claim of self-defense. The video from October 27, 2021, shows Sally hitting John, which was not an uncommon occurrence throughout the relationship, as evidenced by text messages, John's statements, and third-party interviews.

### **The Sanctioning Process**

107. On April 8, 2022, FPU issued a decision finding sufficient evidence of two Title IX "dating violence" violations and four code of conduct violations. The decision found there was insufficient evidence to substantiate any of the Title IX "sexual assault" accusations, and thus dismissed eight of the fourteen counts.

108. FPU's decision required that John leave campus by April 15, 2022. The decision suspended John for three semesters and required him to pay restitution to Sally for the property that was put out in the rain.

109. FPU's written decision stated that the dating violence violated "Franklin Pierce University Title IX Policy *and/or* the Sexual Misconduct Policy," (emphasis added). This decision disregarded FPU's own rules for

its Sexual Misconduct Policy, which requires that the school first determine if an allegation of dating violence meets the requirements for violation of Title IX, and if not, the school must "formally dismiss" the allegation, and then "move forward" with an allegation of violation of FPU's Sexual Misconduct Policy.

110. On April 9, 2022, the day after FPU's decision, Sally appeared at John's townhouse. Sally would have received the same notice of the decision. Thus, she would have known that he would be on campus until approximately April 15, 2022. The no-contact order was a mutual order, running against both parties. Sally was escorted from the townhouse by John's roommate.

111. John complained about the incident to Dean Pollom in writing. He was never told if anything was done about it. Two days later, no longer feeling that FPU would protect him from harassment on campus during the appeal period, John flew home to Minnesota. Except for one brief visit to campus to attend a banquet for the basketball program, John remained in Minnesota for the remainder of the semester and did his coursework remotely.

112. Enclosed with the April 8, 2022 decision was information regarding John's right to appeal and a letter with respect to that appeal. The letter stated:

> As stated in the decision letter, parties are afforded the opportunity to appeal this decision one time within the Franklin Pierce University's process detailed in the Title IX Grievance Policy. If you wish to appeal this decision, you must submit the appeal request to me via email no later than 5

business days following the delivery date and time of this letter.

113. However, the very last page of the Decision stated: "Appeals must be submitted to Dean Pollom, Title IX Coordinator for Student Issues within five business days of the delivery of this decision." The wording in the Final Decision matches the actual rule adopted by FPU, which states: "All requests for a final appeal must be submitted in writing to the Title IX Coordinator or designee within five business days of the delivery of the written findings of the Hearing Panel."

### **The Appeal**

114. On April 15, 2022, John received a letter from Dean Pollom, with an email cover containing the subject line "no appeal received," indicating that the appeal deadline was 10:00 a.m. that day, and that since nothing had been received prior to 10:00 a.m., there was no appeal. This directly conflicted with FPU's own rules stating that John had five business days to file an appeal from the *date* of delivery of the written findings. Just for John's case, and without changing its rules applicable to other students, FPU implemented its own time restriction based on the *hour* the decision was disclosed rather than the *date*.

115. On April 15, 2022, at 2:25 p.m., John filed his appeal by email to Dean Pollom, noting that the rules did not include a time limit like the one FPU imposed.

116. On April 18, 2022, FPU reversed itself on the timeliness-of-appeal issue, deciding to farm out the issue, and the appeal itself, to an

outside attorney. This was the fourth time that FPU impliedly acknowledged it had failed to follow its own rules and procedures.

117. On May 16, 2022, FPU released a decision, denying the appeal. On May 17, 2022, Dean Pollom sent a letter to John, saying that the sanctions were now in effect as a final order.

**Consequences of FPU's Decision**

118. The decision to suspend John for three semesters and place the scarlet letter of "dating violence" on his academic record will have devastating consequences for his ability to transfer to another school, finish his college education, apply to graduate school, and find a meaningful and fulfilling job that uses the skills and knowledge he gained in college.

119. John is a scholarship student in a NCAA Division II basketball program playing within the Northeast-10 Conference. John has lost the benefit of his scholarship and can be expected to have difficulty finding a quality school where he can finish his education and use his last year of NCAA eligibility. John has also lost valuable benefits inuring to a student athlete at a NCAA Division II school, including tutoring and academic advising, athletic, strength and nutritional training, leadership training, career advising and placement, and the opportunity to travel.

120. Without redress from this court, John's transfer application to any school will have to disclose the official discipline and suspension, which will weigh against his admission, particularly when he has only one year of eligibility remaining. The timing of the decision, with only a

few weeks remaining in the academic calendar, will make it more difficult for him to transfer. If he has the opportunity to play professional basketball in the United States or abroad, he will be seen as a risk due to the heightened focus on "character" employed by professional sports teams that need to maintain good public relations and avoid the distractions to the team occasioned by bad publicity.

**CAUSE OF ACTION**

**I.  <u>Title IX</u>**

121. John repeats and realleges the allegations above as if fully set forth herein.

122. Pursuant to Title IX of the Education Amendments of 1972, FPU is prohibited from subjecting John to a disciplinary proceeding where sex is a motivating factor in the decision to impose sanctions.

123. Pursuant to Title IX of the Education Amendments of 1972 Dartmouth is further prohibited from providing a disciplinary proceeding that is not prompt or equitable.

124. FPU's agents and employees made incorrect determinations of fact, ignoring substantial evidence presented that supported John's innocence and undermined Sally's claims against him, resulting in an erroneous outcome in his case.

125. FPU failed to adequately describe and allege the claims against John, putting him at a disadvantage when he was supposed to participate in an investigation on a level playing field, but instead had no

idea and was not informed in a timely manner of the actual details of what he was accused of.

126. FPU failed to conduct its investigation in a balanced and gender-neutral manner by giving Sally the opportunity in a second interview to repair her damaged credibility in a second interview, while denying equal treatment to John, and by unreasonably favoring her testimony over John's in the hearing

127. FPU failed to investigate and pursue disciplinary claims against Sally, even though the uncontradicted evidence established that she committed actual crimes, stealing a cellphone from John, physically assaulted him even as he openly recorded her acts of violence in order to protect himself, and violated the no contact order after FPU released its decision.

## **Breach of Contract**

128. John Doe repeats and realleges the allegations above as if fully set forth herein.

129. John gave countless hours of his life to FPU's basketball team, and chose FPU over other schools, and in return the University contracted to provide John with access to its undergraduate degree program.

130. The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in FPU's written policies.

131. By failing to adhere to their own policies during the investigation and prosecution of this matter, and as described herein, FPU breached its contract with John.

132. Additionally, by the facts alleged herein, FPU breached its contract with John by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

133. John suffered the harms described above, as a direct and proximate result of that breach.

## **Breach of Covenant of Good Faith and Fair Dealing**

134. John Doe repeats and realleges the allegations above as if fully set forth herein.

135. As in all contracts, the contract between FPU and John included an implied covenant of good faith and fair dealing.

136. By the facts alleged herein, FPU breached that covenant by pursuing both the investigation, and the adjudication, in an unfair and biased manner.

137. John suffered the harms described above, as a direct and proximate result of that breach.

### **Negligence**

138. John Doe repeats and realleges the allegations above as if fully set forth herein.

139. FPU had a duty of care, imposed on it by its policies and voluntarily undertaken, to handle allegations of sexual misconduct, relationship violence, and violations of its conduct code fairly and consistently, in accordance with its own rules that were published so that students and the university community could rely on them.

140. By the facts alleged herein, FPU breached that duty by pursuing its investigation and adjudication in a manner that deviated from its policies and was unfair and biased.

141. John suffered the harms described above, as a direct and proximate result of that breach.


WHEREFORE, John Doe respectfully requests that this court enter judgment against defendant on all counts of this complaint. John Doe further requests that this court:

A.  Issue a preliminary injunction enjoining FPU from enforcing John's suspension and ordering it to allow him to remain on campus, attend classes, and participate in all campus activities subject to the no-contact order with Sally Smith, pending the outcome of this action;

B.  Order defendant to reverse its finding that John Doe violated its policies, and expunge his record;

C.  Order defendant to reinstate John Doe as a student in good standing;

D.  Award John Doe damages and enhanced compensatory damages in an amount to be determined at trial;

E.  Award John the reasonable costs of this action, including attorney's fees; and,

F.  Grant such further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

## **VERIFICATION**

I, John Doe, declare as follows:

1. I am the plaintiff in this action.

2. I have personal knowledge of the facts set out in the foregoing Verified Complaint and Jury Demand, and if called upon to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Jury Demand and true and correct.

Date: May 25, 2022          /s/ John Doe          /s John Doe
                                                  John Doe


                                                  Respectfully submitted,

                                                  _____
                                                  Theodore M. Lothstein
                                                  N.H. Bar. No. 10562


                                                  _____
                                                  Richard Guerriero
                                                  N.H. Bar No. 10530


                                                  _____
                                                  Kaylee Doty
                                                  N.H. Bar No. 273677
                                                  Lothstein Guerriero, PLLC
                                                  Five Green Street
                                                  Concord, NH 03301
                                                  TEL: (603) 513-1919