**THE STATE OF NEW HAMPSHIRE**

United States District Court – District of NH

| | |
|---|---|
| John Doe<br><br>v<br><br>Franklin Pierce University | Civil Action No. 1:22-cv-00188 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED RELIEF**

Plaintiff John Doe ("Doe"), by and through counsel, hereby submits this Memorandum of Law in support of his Motion for a Preliminary Injunction and Expedited Relief.

In support, it is stated:

I.      **Statement of Facts**

*A. Background*

1. At all times relevant to this case, Doe was a student at Franklin Pierce University ("FPU"). Throughout his time at FPU, Doe was in an on-again, off-again relationship with Sally Smith ("Smith"). Verified Complaint ("Compl.") ¶ 3. After a physical altercation on October 27, 2021, Smith brought a complaint against Doe. Comp. ¶ 4. The complaint, as described in official correspondence from FPU, referenced only one specific date, October 27, 2021. *Id.*

2. It was only nine days before the scheduled final hearing – after the investigation had closed - that Doe received a detailed list of the charges against him, which included 7 counts of violations of "Franklin Pierce University Title IX Policy *and/or* the Sexual Misconduct Policy," and

1

seven counts of violation of the Franklin Pierce University Code of
Conduct. Compl. ¶ 5; Exh. 1 at 3. These 14 complaints contained not
only the October 27, 2021, date from Smith's complaint, but also a range
of dates spanning over the course of years. Compl. ¶ 60-81; Exh. 1 at 3.
More than two weeks after the investigation had officially closed, this was
the *first time* that Doe received a notice of the charges against him.
Compl. ¶ 85; Exh. 1 at 3.

3. On April 8, 2022, after a Title IX evidentiary hearing, FPU announced
Doe's suspension for three semesters and a permanent brand on his
school record as a perpetrator of "dating violence." Compl. ¶ 1. The
board-issued decision found sufficient evidence of two Title IX "dating
violence" violations and four code of conduct violations. The decision
found there was insufficient evidence to substantiate any of the Title IX
"sexual assault" accusations, and thus dismissed eight of the fourteen
counts. Compl. ¶ 107.

4. On April 15, 2022, Doe filed a timely appeal with FPU which was denied
on May 16, 2022. Compl. ¶¶ 115, 117.

5. On May 17, 2022, Dean Pollom of FPU sent Doe a letter stating that the
sanctions were now in effect as a final order. Compl. ¶ 117.

*B. FPU's Procedurally Deficient Investigation*

6. FPU's investigation into Smith's allegations and the proceedings that
resulted in the sanctions against Doe were procedurally deficient. The
Investigator hired by FPU, Attorney Susan Schorr, contacted Doe on
November 8, 2021, to schedule an interview. Compl. ¶ 38; Exh. 1 at 10.

Prior to Doe's interview, Attorney Schorr interviewed Smith on November 19, 2021. Doe participated in a recorded interview with Attorney Schorr on December 14, 2021, with his identified advisor, Attorney Lothstein, present. Compl. ¶ 39; Exh. 1 at 9.

7. Prior to Doe's interview on December 14, FPU still had not provided any "sufficient detail," including "time, date, location, etc." for the allegations against Doe, other than the October 27, 2021, incident. Compl. ¶ 39; Exh. 1 at 3. In the interview, Doe was asked questions about twenty different episodes by Attorney Schorr with no prior notice. This denied him a meaningful opportunity to prepare for the interview and denied him the rights he was entitled to under FPU's Title IX Grievance policy. Compl. ¶ 41.

8. Near the end of the December 14 interview, Attorney Schorr indicated that she anticipated another interview with Doe. Compl. ¶ 42; Exh. 1 at 8. Despite, her representations, Attorney Schorr did not provide Doe with a second interview. Compl. ¶ 44; Exh. 1 at 1. Attorney Schorr had, however, provided Smith with a second interview, giving Smith an opportunity to address any credibility concerns after an unsatisfactory first interview.[1] Compl. ¶ 49; Exh. 1 at 1.

9. On January 21, 2022, after not hearing anything from Attorney Schorr for over a month, Attorney Lothstein emailed Attorney Schorr to follow up on Doe's first (and only) interview. Compl. ¶ 49; Exh. 1 at 12. Attorney

---

[1] Attorney Schorr noted that through the investigation it became apparent that Smith had not been fully forthcoming in her first interview. Compl. ¶ 45.

Schorr responded that she submitted the investigation report to the Title IX office and that Attorney Lothstein would receive it soon. *Id.*

10.     On February 14, 2022, Doe was emailed the draft investigation report, however, it was not sent to his identified advisor, Attorney Lothstein, violating FPU policy and federal law. Compl. ¶¶ 51-52; Exh. 1 at 2.

11.     Doe did not see the email until after the deadline to respond to the draft investigation report had passed. Compl. ¶ 55; Exh. 1 at 2. It was only after finding this email, that Doe became aware of the full scope of allegations, which had never been made available to him during the investigation itself. *Id.*

12.     Throughout the course of the investigation, FPU violated multiple FPU policies and federal law. Doe brought all of these violations of FPU policies and federal law to FPU's attention, prior to the conduct hearing, in the form of a motion to dismiss directed to Dean Andrew Pollom. Exh. 1 at 1. The entire response offered by FPU to Doe was: We don't have a procedure for a motion to dismiss.

13.     On information and belief, Dean Pollom, and FPU, did absolutely nothing to correct the obvious infirmities, inequities, and lack of impartiality in the process. The defendant is wrong to claim to this court in its motion to dismiss that it can wash its hands of any bias on the part of Attorney Schorr or Attorney O'Leary, because they are not employed by FPU. When FPU did nothing to rectify the situation, FPU itself manifested the same bias and callous disregard of Doe's right and

contractual expectation of having a reasonably fair and impartial hearing process.

14.     Additionally, through the course of FPU's investigation, wrongful conduct on Smith's behalf came to light. Specifically, evidence that Smith had pushed Doe into a lake, destroying Doe's phone, Compl. ¶ 45, that Smith went into Doe's room uninvited and refused to leave on multiple occasions, Compl. ¶¶ 77, 83, that Smith had stolen Doe's phone, causing him substantial panic and distress, Compl. ¶ 74, that Smith had shown up at Doe's residence to harass him during the pendency of a mutual no-contact order, Compl. ¶ 110, and that Smith had assaulted Doe and bit him, Compl. ¶82. All of this was brought to FPU's attention while the investigation was still open. Exh. 1 at 12. Despite Smith's own misconduct, on information and belief, FPU did not initiate any investigation or disciplinary proceedings in response, and did not take any corrective action to ensure that the investigation was unfolding in an impartial manner, free of gender-bias.

*C. FPU's Errors have resulted and will result in harm to Doe*

15.     As a result of FPU's erroneous proceeding and decision, Doe is suffering and will continue to suffer irreparable harm. Prior to the imposed suspension, Doe was on track to graduate in December of 2022 and looked forward to pursuing a master's degree. The decision to suspend Doe took away his ability to return for his last semester at FPU, which is required for Doe to graduate. Doe now has a 3-semester gap that he will need to explain to future employers and potential master's

degree programs. Moreover, his entire education has been delayed and any aspirations of earning a post-graduate degree or finding employment will be set back by over a year.

16.     Additionally, the fact that Doe has been suspended, and the underlying reason, places doubt on his ability to transfer to another school. Without redress from this Court, Doe's transfer to any college will require him to disclose the suspension, which will weigh against his admission. Further, Doe was attending FPU with a full scholarship. Doe would be taking on a significant financial burden in transferring to a college where he does not have such financial assistance.

17.     Without a preliminary injunction issued by this Court, Doe will continue to suffer these and other irreparable harms. Doe seeks redress from the Court to undo the harms FPU has caused and to avoid further irreparable harm. Accordingly, Doe is entitled to a preliminary injunction enjoining his suspension and any other disciplinary action pending the outcome of this case.

**II.     Legal Standard**

18.     The First Circuit has held that injunctive relief is available under Title IX. *Cohen v. Brown University*, 101 F.3d 155, 167 (1st Cir. 1996).

19.     Injunctive relief is also available under state law for a breach of a contract. *N.H. Dep't of Envtl. Servs. V. Mottolo*, 155 N.H. 57, 63 (2009) ("To be entitled to injunctive relief, the moving party must show that it is likely to succeed on the merits of the case and that there is an immediate danger of irreparable harm with no adequate remedy at law.") (quotations

omitted); 4 N.H. Practice and Procedure ¶ 19.14 (2022); *see High Liner Foods (USA), Inc. v. Groves*, No. 218-2019-CV-1780, 2020 N.H. Super. LEXIS 10 (Apr. 12, 2020) (court issued preliminary injunction, pending trial on the merits, enjoining former employee from engaging in specific behavior in breach of covenants of the contract).

20.     In order to succeed on a motion seeking a preliminary injunction, under federal law courts consider four factors: (1) the likelihood the movant will succeed on the merits; (2) that the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Voice of The Arab World Inc., v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

21.     "While all four factors must be weighed, the moving party's likelihood of success on the merits is 'the touchstone of the preliminary injunction inquiry.'" *Bray v. Worcester Polytechnic Inst.*, 540 F. Supp. 3d 94, 100 (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998)).

22.     "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success – rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).

23.     Doe has shown a likelihood of success on the merits of his Breach of Contract and Title IX claims.

**III.    Plaintiff satisfies all four factors required for injunctive relief.**

A. *Likelihood of Success on the Merits*

(1) Breach of Contract

24.     Doe has alleged sufficient facts to demonstrate a likelihood of success on the merits of his breach of contract claims against FPU. The relationship between a university, and its students is contractual in nature. *Marlow v. Keene State Coll.,* 189 F. Supp. 3d 397, 415 (D.R.I. 2018) ("[A] student's relationship to his university is based in contract.") (internal citation omitted); *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 169 (D. Mass. 2017) ("[T]he relationship between a student and a university is based on contract."). "The terms of this contract [are] the terms contained in the Student Handbook and other college materials." *Bleiler v. Coll. Of Holy Cross*, No. 11-11541-DJC, 2013 U.S. Dist. LEXIS 127775, 2013 WL 4714340, Slip Op. at 44 (D. Mass. Aug. 26, 2013).

25.     When reviewing the contractual relationship and the relevant documents, courts "employ a reasonable expectations standard," which requires that they "ask what meaning the party making the manifestation, the university should reasonably expect the other party [the student] to give it." *Doe v. Trs. Of Boston Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (internal citations and quotation marks omitted). "In the context of disciplinary hearings, [courts] 'review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules." *Id.* (quoting *Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 724-725 (1st Cir. 1983)). "[I]f the facts show that the university has failed to meet [the student's] reasonable expectations the

university has committed a breach." *Id.* (quoting *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61-62 (1st Cir. 2016) (internal quotation marks omitted).

26.     Based on the above standards and the following reasons, John Doe is likely to succeed on his breach of contract claim.

27.     The terms of the contractual relationship between Doe and FPU include provisions in FPU's Title IX Policy *and/or* Sexual Misconduct Policy. Prior to initiating an investigation into a complaint, FPU's Title IX Policy mandates that "[a]ll parties will receive a Notice of Investigation which shall include information regarding the Title IX Grievance process, . . . [and] the allegations of the sexual harassment or assault (including sufficient detail, identities of parties, date, time, location, etc.)." Compl. ¶ 35.

28.     Despite this policy, FPU did not provide such a notice prior to initiating its investigation into Smith's complaint against Doe. Compl. ¶ 36.

29.     In addition to requiring written notice of the date, time, location, and "sufficient detail" of the alleged conduct in violation of FPU's Title IX policy prior to the initiation of the investigation, FPU's Title IX policy mandates further notice *during* the investigation as follows: "Any new alleged violations that come about during the investigatory process will result in a new/updated notice to all parties." Compl. ¶ 43.

30.     These are critical procedural safeguards to ensure a fair disciplinary process, where the student receives the most fundamental

elements of due process: Prior notice of what the student is accused of, so the student can meaningfully participate in the investigation process, conduct his own investigation, and be able to provide an accurate and thorough response. Further, if the accusations evolve or new ones are brought during the investigation, as occurred in this case, that an updated notice be provided, for those same reasons.

31.     Over the course of the investigatory process from November 8, 2021, until January 21, 2022, FPU never provided any "new/updated notice" describing the "new alleged violation," other than the description of the single event alleged to have occurred on October 27, 2021, in violation of its own written policy. Rather, it simply allowed an investigator retained by FPU to bombard Doe with questions about events in the relationship history that spanned over years without any sort of prior notice, in violation of its own rules.

32.     FPU's disregard of its own rules also violated 34 CFR 106.45(b)(1)(i), which states that schools must "treat complainants and respondents equitably…." This was not equitable given that Smith, as the accuser, presumably knew all of her stories before the investigation began and had ample time to prepare her presentation of those alleged events, whereas Doe knew nothing, and was blindsided during the investigation.

33.     After the investigation is undertaken, FPU Title IX policy requires that "[b]efore the report is completed, the investigator will send the report and accompanying evidence to the complainant and Respondent and

10

their respective identified advisors." Compl. ¶ 51. Again, this is not a minor technicality, but a procedural safeguard that gives each side an opportunity to correct mistakes made in the report, provide additional information, identify additional witnesses that should have been interviewed, and otherwise take steps to ensure that the investigation is thorough and accurate.

34.      But FPU failed to send the investigation report to Doe's identified advisor. Doe himself did not see the email until it was too late to respond, something that never would have happened if the email had been copied to his advisor, an attorney in a law firm who has professional and ethical responsibilities to keep up with matter-related correspondence.

35.      FPU's failure to send the investigation report to Doe's identified advisor violated not only FPU's own policy, but also federal law, 34 C.F.R. 106.45(b)(5)(vi). More importantly, it harmed Doe, as the "draft" report became a final report, and the open investigation became a closed investigation, with no response from him, whereas Smith provided a very lengthy and detailed response to the draft report.

36.      On March 15, 2022, John received, *for the first time*, and more than two weeks after the investigation had officially closed, a Notice of Charges. On March 21, 2022, John requested another continuance of the hearing, as the Notice of Charges was provided to him less than nine 24-hour periods before the scheduled March 24 hearing. Once again, FPU had violated its own written policies.

37.     Another such violation included the exclusion of John's confidential support person, when FPU policy *required* that the confidential support person be allowed to attend the hearing. FPU IX 21; SMP 16.

38.     Doe brought all of these procedural infirmities to the attention of Dean Andrew Pollom, Title IX Coordinator, in the form of a motion to dismiss. Exh. 1 at 1. Dean Pollom proceeded to reject the motion, providing no other explanation other than the fact that FPU did not have a procedure for a motion to dismiss. Dean Pollom, in communications with Doe and his advisor, did not apologize for, defend, or even acknowledge Doe's many specific complaints about the utter disregard of his procedural and substantive rights discussed in his motion to dismiss. On information and belief, Dean Pollom made no effort whatsoever to try to take control of the proceeding, eliminate the bias evident in the episodes discussed in the motion to dismiss, provide additional training and/or direction to its agents as to the governing rules and expectations of the college, or otherwise rectify the procedural errors that had occurred. Thus, FPU is wrong when it states that if anyone exhibited a lack of impartiality or bias, it was only outside contractors, Attorney Schorr and/or Attorney O'Leary.

39.     Shortly after receiving this correspondence, Attorney Lothstein reached out to Dean Pollom to verify if FPU's response indicated they would not let Attorney Lothstein attend the hearing as a confidential support person, despite being confronted with their own policy requiring

otherwise. Dean Pollom responded to that email, stating that the request

has already been addressed. However, just minutes after this email,

Attorney O'Leary called Attorney Lothstein and retracted FPU's decision,

stating that Attorney Lothstein would be allowed to attend the hearing

after all. Attorney Lothstein had changed the dates of his planned trip

and thus was able to attend the hearing as John's confidential support

person.

40.     This reversal of position was the third instance during the

proceedings of FPU implicitly acknowledging that it had failed to follow

its own rules. And the fact that Dean Pollom would disregard the blatant

violation of FPU's rules, only to see his own decision reversed by Attorney

O'Leary within minutes, again undermines FPU's position that its own

employees did nothing wrong and manifested no bias during this

disciplinary process.

        (2) Title IX Claim

41.     "Title IX prohibits gender-based discrimination in a wide array of

programs and activities undertaken by education institutions." *Amherst

Coll.,* 238 F. Supp. 3d at 221 (citing *Frazier v. Fairhaven Sch. Comm.*, 276

F.3d 52, 65 (1st Cir. 2022)). "One of the purposes of Title IX is 'to provide

individual citizens with effective protection against [discriminatory]

practices." *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704

(1979)). Specifically, "Title IX provides that '[n]o person in the United

States shall, on the basis of sex . . . be subjected to discrimination under

any education program or activity receiving Federal financial assistance.'"

*Trs. of Boston Coll.* 892 F.3d at 89-90 (quoting 20 U.S.C. § 1681(a)). The U.S. Department of Education interprets "program" to include "all of the operations of . . . [a] college university, or other postsecondary institution." 34 C.F.R. §106.2(h)(2)(i). Title IX "is enforceable through an implied private right of action." *Trs. of Boston Coll.*, 892 F.3d 67, 90 (1t Cir. 2018) (internal quotation marks and citations omitted).

42.     In this age of heightened sensitivity to allegations of sexual misconduct, a court in this circuit has pointed out that "[c]ourts increasingly see claims brought pursuant to Title IX by male students who have been found responsible and disciplined for violating the sexual misconduct policies colleges use to deter and respond to sexual misconduct." *Amherst Coll.,* 238 F. Supp. 3d at 222 (collecting cases). And, while "[n]either the Supreme Court nor [the First] Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX," the courts in both the Amherst College and the Boston College cases apply the framework set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). *Trs. of Boston Coll.*, 892 F.3d at 90; *see also Amherst Coll.*, 238 F. Supp. 3d at 222.

43.     In the absence of authority to the contrary, Doe argues his claims pursuant to that framework and establishes that his claims are likely to succeed when viewed in light of a full evidentiary record. "In Yusuf, the Second Circuit described two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX

cases. In one category are claims alleging bias in the disciplinary process led to an erroneous outcome. The other category includes claims asserting selective enforcement." *Amherst Coll.,* 238 F. Supp. 3d at 222 (citing *Yusuf*, 35 F.3d at 715).

44.      To succeed on an erroneous outcome theory, a plaintiff must allege facts "'casting some articulable doubt on the accuracy of the outcome of the challenged disciplinary proceeding" and allege facts "indicating that "'gender bias was a motivating factor."' *Doe v. Trustees of Boston Coll.,* 892 F.3d 67, 90 (1st Cir. 2018) (quoting *Yusuf*, 35 F.3d at 715). The second factor has also been described as a requirement to "show a causal connection between gender bias and the outcome of the proceeding." *Doe v. Trs. of Darmouth Coll.,* No. 22-cv-018-LM at *17 (D.N.H. July 12, 2022) (citing *Trs. of Bos. Coll.*, 892 F.3d at 90 (1ˢᵗ Cir. 2018)).

45.      Articulable doubt can be shown through allegation of a "particular evidentiary weakness" or "particular procedural flaws affecting the proof." *Doe v. Trustees of Dartmouth College*, No. 22-cv-018-LM, *6, 2020 U.S. Dist. LEXIS 62564, 2022 WL 1004210 (D.N.H. July 12, 2022) (quoting *Yusuf v. Vassar College*, 35 F.3d 709,715 (2d Cir. 1994)).

46.      In satisfying the second factor, "[a] plaintiff may rely on circumstantial evidence alone to show causation in a Title IX claim." *Trs. of Darmouth Coll.,* No. 22-cv-018-LM, Slip Op. at *19 (D.N.H. July 12, 2022) (citing *Yusuf*, 35 F.3d at 715 (2d Cir. 1994)); *Trs. of Bos. Coll.* 892 F.3d at 92.

47.     In this case, Doe has a reasonable likelihood of success on an

erroneous outcome theory.

48.     The complaint adequately and extensively alleges facts falling

within both of these categories. Exh. 1 at 3-4, Compl. ¶¶ 5, 36, 39, 44,

84-85 (FPU did not provide notice of the 14 charges until after it closed

the investigation, and shortly before the adjudicatory hearing, in

violation of its own rules and federal law); Exh. 1 at 4-5, Compl. ¶ 8 (FPU

"repeatedly barred evidence that impeached Sally's credibility, and the

credibility of other witnesses, characterizing it as 'irrelevant.'"); Exh. 1 at

2-3, Compl. ¶¶ 41, 45-46, 48-49, 56-58 (FPU conducted the interviews of

Smith and Doe in an inequitable, unfair and biased manner that

compromised the integrity of the factfinding process and bolstered

Smith's credibility over that of Doe in a misleading and fundamentally-

unfair manner); Exh. 1 at 2-3, Compl. ¶¶ 50-55 (FPU failed to follow its

own policy, and federal law, by not sending the investigative report to

Doe's advisor, which compromised the integrity of the proceedings).

49.     Further, Doe has alleged sufficient facts to present a plausible

claim that gender bias was a motivating factor in FPU's investigative and

hearing process. *See* Exh. 1 at 1; Compl. ¶¶ 46, 48-40, 56 (when Smith

misled FPU in her first interview, she was granted a second interview to

rehabilitate her credibility, yet no such opportunity was given to Doe,

even when FPU's agent criticized his credibility in his first and only

interview); Exh. 1 at 1, Compl. ¶¶ 56--58 (FPU provided no required

notice of charges to Doe prior to his interview, and then critiqued his

credibility for being "vague" in his responses compared to Smith, when FPU had blindsided Doe with questions about 19 different unnoticed-allegations while fully aware that Smith, the author of the allegations, knew of all of them prior to her interview); Exh. 1 at 1, Compl. ¶¶ 63-64 (FPU credited Smith's credibility over that of Doe, because Doe was "vague" in responses to un-noticed allegations, when Smith had given conflicting statements about events to different people and had a motive to lie); Compl. ¶¶ 70, 74-76, 81-83, 110-111 (Despite Smith stealing Doe's phone, pushing him into the lake, hitting John, biting John, violating a wiretapping law, harassing him during the pendency of a mutual no-contact order, and despite text message evidence about her physical aggression towards Smith, FPU did not investigate Smith's misconduct or begin any sort of disciplinary process to address it); Compl. ¶¶ 77 (when Smith entered Doe's room without permission, and refused to leave upon multiple requests, FPU disciplined Doe for physically removing Smith from his own room, but sought no accountability against Smith for trespassing and being the initial aggressor in the encounter).

50.     One particular episode vividly demonstrates FPU's unequal treatment of similar conduct when committed by a male, Doe, versus when committed by a female, Smith. Doe was disciplined for putting Smith's personal property outside in the rain during an altercation, and ordered to pay restitution to Smith. Smith, however, was not disciplined for pushing Doe into a lake, while Doe had his cellphone on him, which

resulted in the destruction of Doe's cellphone. Compl. ¶¶ 45, 70, 83, 108.

51.     "In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of the punishment to impose upon him." *Amherst Coll.*, 238 F. Supp. 3d at 223. "Unlike an erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding." *Id.* at 222 (citing *Yusuf,* 35 F.3d at 715).

52.     Here, the evidence as to the selective enforcement is apparent in the investigation and proceedings at issue. The female complainant in this matter was always fully aware of the allegations, of course, since she made them. She was allowed a second interview to address credibility concerns and ultimately her credibility was bolstered by the investigator during the final hearing, despite her many inconsistencies and former omissions of fact. These same opportunities were not provided to Doe, a male student, despite being in a much more difficult position than Smith, since he had not been provided prior notice of the allegations. He went into an interview having no idea what topics would be addressed, and thus, had no ability to prepare by, for example, looking through cellphone messaging and photographs contemporaneous to alleged events, talking to fellow students who may have witnessed events, etc.

53.     Moreover, Doe brought concerns about Smith's actions that *should* have prompted an investigation into whether she had committed dating violence or violated the student code of conduct to Attorney O'Leary in the prehearing conferences. Despite Smith admitting to stealing Doe's phone and text message evidence about her physical aggression towards Smith, FPU did not investigate Smith's misconduct or bring any sort of disciplinary process to address it.

54.     Doe has alleged sufficient facts to establish a likelihood of success on the merits of his Title IX selective enforcement claim.

*B. Doe will suffer irreparable harm in the absence of preliminary relief.*

55.     Courts have held that allegations that a suspension or expulsion from college would damage a student's academic and professional reputation are sufficient to establish irreparable harm at the preliminary injunction stage. *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016).

56.     Specifically, courts have recognized that,

> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, Slip Op. at 9, 2015 U.S. Dist. LEXIS 124540 (D. Vt. Sept. 16, 2015).

57.     Similarly, a court granted a preliminary injunction against a university in part because the plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester...." *King v. DePauw Univ.*, No. 2:14-cv-70-WTL-DKL, Slip Op. at , 2014 U.S. Dist. LEXIS 117075, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014). The court explained that the gap created in his record would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admission committees, which would require him to reveal that he was found guilty of sexual misconduct by [the university]." *Id.*

58.     Here, Doe has one last semester to finish before graduating in December of 2022. This three-semester suspension will cause a significant gap in his education which he will have to explain to future employers and post-graduate programs. Moreover, the suspension wholly delays Doe in obtaining his degree(s) and entering the workforce. Additionally, if Doe is forced to finish his last semester elsewhere, he will lose out on his full scholarship and face significant financial burdens.

59.     Further, Doe would suffer irreparable harm in the denial of his constitutional right to equal treatment under the Fourteenth Amendment. See *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016). In the *Portz* case, the court recognized that even though the school was a private institution, the plaintiffs suffered irreparable harm due to their "expectation that they may

be treated unequally in violation of Title IX's terms," because "when the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm regardless of whether the plaintiff seeks redress under the Fourteenth Amendment itself or under a statute enacted via Congress's power to enforce the Fourteenth Amendment," such as Title IX. *Id.* As such, Doe has suffered irreparable harm that will only continue and increase in the absence of an injunction in this case.

### C. The balance of equities weighs in favor of a preliminary injunction

60.     In *Doe v. Middlebury College*, the court held that while the plaintiff was "likely to suffer irreparable harm if he is expelled, it is unlikely [the university] will suffer great damage or loss as a result of the issuance of a preliminary injunction preventing the expulsion of [Plaintiff] for the fall semester." *Doe v. Middlebury Coll.*, supra, Slip Op. at *9-10. The Court further recognized that while the university would suffer interference with its process regarding allegations of sexual misconduct if an injunction were granted, it could still refuse to grant the plaintiff a degree if it ultimately prevailed. *Id.* Accordingly, the idea of the plaintiff being unable to return to campus without an injunction, even if he ultimately prevails on his claims, weighs in favor of granting the injunction. *Id.*

61.     In this case, the balance of equities weighs in favor of a preliminary injunction because, while Doe will suffer immediate and lasting

irreparable harm without one, FPU will suffer only limited harm if it ultimately prevails, and the injunction is lifted.

62.     Additionally, the harm against Smith is minimal, if any. On information and belief, when Smith graduated in spring 2022, she moved on to another school, so FPU does not have to be concerned about continuing interpersonal conflict between the two, enforcing a no-contact order between the two, or other distractions that might arise when both are on campus together.

*D.  A preliminary injunction is in the public interest*

63.     Courts have held that when a plaintiff has a likelihood of success on a Title IX claim, "the public interest weighs in Plaintiff['s] favor because the public's interest in eradicating sex discrimination is compelling." *Portz*, 196 F. Supp. 3d at 978 (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983)).

**IV.    Conclusion**

64.     For the foregoing reasons, Doe is entitled to preliminary injunctive relief. Accordingly, Doe respectfully requests that the Court grant his motion for preliminary injunction and enjoin FPU's suspension of Doe pending the outcome of this case. Doe further requests oral argument and an expedited hearing.

Respectfully submitted,

*/s Kaylee C. Doty*
_____
N.H. Bar No. 273677

*/s Theodore M. Lothstein*

_____
Theodore M. Lothstein
N.H. Bar. No. 10562

## CERTIFICATION

I, Kaylee Doty, hereby certify that a copy of this motion will be sent to all registered subscribers to this case on ECF through the electronic filing system.

*/s Kaylee C. Doty*

_____